1  Jason M. Ingber (SBN 318323)
   Serach B. Shafa (SBN 358332)
2  **Ingber Law Group**
   3580 Wilshire Blvd., Suite 1260
3  Los Angeles, California 90010
   Tel: (213) 805-8373
4  E-mail: ji@jasoningber.com

5  Attorneys for Plaintiff Stacy Ross

6

7                    **UNITED STATES DISTRICT COURT**

8              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9                        **WESTERN DIVISION**

10

11  STACY ROSS, individually and on behalf of   | Case No.:
    all others similarly situated,
12                                              |
                        Plaintiff,              | **CLASS ACTION COMPLAINT FOR:**
13          v.                                  |
                                                | **(1) FRAUD**
14  HYUNDAI MOTOR AMERICA, a California         | **(2) BREACH OF EXPRESS**
    corporation; FIRSTELEMENT FUEL INC., a      |     **WARRANTY (SONG-BEVERLY**
15  California corporation; GAVIN NEWSOM, in     |     **CONSUMER WARRANTY ACT)**
    his official capacity as Governor of California; | **(3) BREACH OF IMPLIED**
16  and DOES 1 through 10, inclusive,           |     **WARRANTY OF**
                                                |     **MERCHANTABILITY (SONG-**
17                      Defendants.             |     **BEVERLY/ MAGNUSON-MOSS)**
                                                | **(4) VIOLATIONS OF CONSUMER**
18                                              |     **LEGAL REMEDIES ACT (Cal. Civ.**
                                                |     **Code § 1750 et seq.)**
19                                              | **(5) FALSE ADVERTISING (Cal. Bus. &**
                                                |     **Prof. Code § 17500)**
20                                              | **(6) VIOLATIONS OF CAL. BUS. &**
                                                |     **PROF. CODE § 17200 et seq.**
21                                              | **(7) NEGLIGENCE**
                                                | **(8) MAGNUSON-MOSS WARRANTY**
22                                              |     **ACT (15 U.S.C § 2301 et seq.)**
                                                | **(9) INJUNCTIVE RELIEF**
23

24                                              | **DEMAND FOR JURY TRIAL**

25

26

27  Plaintiff STACY ROSS ("Plaintiff") pleads as follows:

28

---
- 1 -
**COMPLAINT FOR DAMAGES**

## INTRODUCTION

1.    This class action arises from Defendants' systematic deception regarding the Hyundai Nexo hydrogen fuel cell vehicle and its supporting infrastructure, affecting hundreds of California consumers. Defendant Hyundai markets the Nexo as a practical zero-emissions vehicle suitable for daily transportation while concealing critical limitations that make it unfit for ordinary consumer use. These limitations include a severely inadequate service network, unreliable fueling infrastructure, persistent safety defects, and undisclosed environmental harms. Through their joint participation in the hydrogen fuel industry's development, both Defendants Hyundai and FirstElement have perpetuated a system that consistently fails consumers while continuing to market and sell vehicles they know cannot be practically operated. Meanwhile, Defendant Newsom continues to allocate substantial taxpayer funds to support this failing infrastructure despite clear evidence of its commercial non-viability and environmental harm.

## PARTIES

2.    Plaintiff STACY ROSS ("Plaintiff") is an individual residing in Sylmar, California.

3.    Defendant HYUNDAI MOTOR AMERICA ("Hyundai") is a California corporation with its principal place of business in Fountain Valley, California.

4.    Defendant FIRSTELEMENT FUEL INC. ("FirstElement") is a California corporation based in Irvine, California, that owns and operates hydrogen fueling stations throughout California under the "True Zero" brand name.

5.    Defendant GAVIN NEWSOM is sued in his official capacity as Governor of California.

**COMPLAINT FOR DAMAGES**

6.      The true names and capacities of DOES 1 through 10 are currently unknown to Plaintiff. Plaintiff will amend this complaint to show their true names and capacities when ascertained.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's Magnuson-Moss Warranty Act claim arises under federal law. The amount in controversy exceeds $50,000, exclusive of interest and costs, based on: a. The purchase price of the Vehicle ($71,493.98); b. Incidental and consequential damages; c. Civil penalties available under state law; d. Attorney's fees recoverable by statute; and e. The diminution in value of the Vehicle.

8.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, Defendants reside in this District, and Defendants are subject to personal jurisdiction in this District.

10.     Assignment to the Western Division of this District is proper pursuant to Local Rule 3-2 because a substantial part of the events giving rise to this action occurred in Los Angeles County.

## GENERAL ALLEGATIONS

### Background and Industry Practices

11.     Under the guise of environmental progress, Defendant Newsom, Hyundai, and FirstElement exploit California taxpayers and consumers. Hyundai systematically

- 3 -
**COMPLAINT FOR DAMAGES**

deceives consumers into purchasing vehicles are not practically operable, while Newsom diverts millions in taxpayer dollars to fund a demonstrably failed hydrogen infrastructure.

12.     For years, Hyundai has lobbied California politicians to fund light-duty hydrogen fuel vehicles, while Defendant Newsom has eagerly dispensed public funds despite mounting evidence of the program's failure. The California Energy Commission, under Newsom's administration, has provided $1,451,000 for every True Zero / FirstElement hydrogen fuel station, though each station consistently closes within eighteen months of opening.

13.     A comprehensive U.S. Department of Energy study reveals that during the first six months of 2021—supposedly the peak period for hydrogen infrastructure in California—hydrogen fuel stations spent over 11,700 hours undergoing maintenance compared to fewer than 9,600 hours actually pumping hydrogen. Even when operational, these stations ran at only 60% capacity due to equipment failures and supply disruptions. Despite these documented failures, Defendant Newsom continues to allocate state funds for new stations.

14.     Newsom has projected 200 hydrogen stations by 2025 and plans to spend another $200 million on 179 stations by 2027, yet there are currently fewer than 36 active stations statewide.

15.     As a leading automaker in hydrogen-fueled car sales, Hyundai posseses exclusive knowledge of material facts regarding their hydrogen vehicles and infrastructure limitations. Through their joint participation in the California Hydrogen Fuel Cell Partnership with Defendant Newsom's administration, Defendants maintain real-time access to station operational data showing systematic failures.

16.     Hyundai, Toyota, their shell entities, affiliated hydrogen fuel station operators, California politicians including Defendant Newsom, and regulators who collectively maintain this failing California Hydrogen Fuel Cell Partnership program at taxpayer expense.

- 4 -
**COMPLAINT FOR DAMAGES**

17. Hyundai approves each station's construction, location, and operating standards, while Newsom's administration provides the funding regardless of commercial viability or environmental impact.

18. Hyundai aggressively markets the Nexo without disclosing severe limitations, leading consumers to purchase vehicles they cannot reliably operate or resell. Defendant Newsom continues to direct taxpayer funds to a program with well-documented failures, despite overwhelming evidence that hydrogen infrastructure is not commercially viable. The online fuel map maintained by the California Fuel Cell Partnership is inaccurate, frequently directing consumers to hydrogen stations that appear online as operational but are non-functional upon arrival.

19. Members of the California Fuel Cell Partnership, including Hyundai and FirstElement, have exclusive access to real-time hydrogen station operational status and historical reliability data that consumers do not. For example, Partnership members are aware that no new stations will be built in the future and that most stations close within 18 months after opening.

20. Hyundai's role in station approval, coupled with Newsom's continued funding, has led to a situation where consumers purchase vehicles they cannot reliably refuel or maintain.

21. A significant fact remains that California hydrogen stations are non-operational more often than operational, yet Newsom's administration continues funding new stations without accountability.

22. The only other market for the Hyundai Nexo is South Korea, Hyundai's headquarters. Hyundai reportedly sold over 5,000 Nexos in South Korea, compared to 2,000 in California, with hydrogen fuel stations in South Korea having similar limitations to those in California.

23. The stark contrast between South Korea and California highlights the program's failure. California's land area is four times larger than South Korea's, yet

**COMPLAINT FOR DAMAGES**

there are fewer than 18 functioning hydrogen fuel *nozzles* in California compared to the 170+ *stations* in South Korea.

24.     Hyundai and FirstElement knowingly maintain an inaccurate online fuel map that misleads consumers into believing hydrogen fuel is more accessible than it actually is. Consumers frequently arrive at stations listed as "operational" only to find them non-functional. Hyundai and FirstElement are aware that when three hydrogen cars refuel consecutively, the pump nozzle frequently freezes onto the third vehicle. The nozzle remains frozen for varying durations-10 minutes on a hot day and up to an hour and a half on a cold day. Despite the regularity of this issue, it is not disclosed to consumers.

25.     Defendants fail to inform consumers of systemic issues, including the 30+ minute average refueling time due to nozzle freezing, and actively suppress information online while continuing to promote expansion.

26.     Hyundai also falsely markets the Nexo's range capabilities, claiming that its fuel tank capacity is 6.33 kilograms and that the vehicle can travel up to 380 miles per tank. In reality, consumers report being unable to fill the tank to capacity, often only achieving 60-80% of the advertised range.

27.     The California fueling standard, SAE J2601, mandates that stations must recompress hydrogen between refueling sessions, a fact Hyundai and FirstElement knowingly fail to disclose. This results in extensive wait times at fuel stations, with consumers routinely waiting over 30 minutes between fills.

28.     This funding scheme has real consequences for California consumers. Nexo owners report widespread electrical system failures, ranging from inconveniences like USB connectivity problems to serious safety concerns, including unresponsive acceleration, infotainment system blackouts, and safety recalls related to potential vehicle explosions.

29.     These defects, compounded by fueling limitations, have forced consumers to abandon regular use of their vehicles, rendering them worthless while Newsom continues to allocate taxpayer money to expand this failing system.

<u>Nexo Purchase and Initial Representations</u>

30.     The Nexo comes in two trim levels – "Blue" and "Limited" – with Hyundai advertising respective ranges of 380 and 354 miles per tank, based on a stated fuel capacity of 6.33 kilograms.  Hyundai ubiquitously advertises that "the All-New NEXO takes only five minutes to refuel." The dealership sales agents promise customers at every sale for a Nexo that additional hydrogen stations will open.

31.     On October 6, 2023, Plaintiff purchased a new 2023 Hyundai Nexo Fuel Cell Limited Edition vehicle, VIN KM8J84A67PU035589 (the "Vehicle") from PB and J Automotive, Inc. (Tustin Hyundai), a licensed authorized Hyundai dealership in Tustin, California. (See Exhibit A – Purchase Agreement)

32.     Prior to her purchase, Defendant Hyundai made multiple material representations that induced Plaintiff to purchase the Vehicle. Specifically, Hyundai sales representative, Rick Majors, made material misrepresentations to Plaintiff, including false promises about CVRP incentive eligibility and hydrogen fuel station availability. Majors falsely promised Plaintiff would receive a $7,500 Clean Vehicle Rebate Project incentive, which she has never received. This representation was material to Plaintiff's purchase decision

33.     During the sales process, Majors further represented that the Nexo is an eco-friendly vehicle that is as easy and quick to fuel as a conventional gas vehicle, that an expanding network of hydrogen fuel stations would be rapidly built (with allusions to the fact that Hyundai would personally build these hydrogen stations) to support Nexo owners, and that the Nexo is a reliable vehicle suitable for daily transportation needs.

<u>Concealed Information and Service Limitations</u>

34.    Prior to purchase, Defendant Hyundai failed to disclose numerous material facts, including that: **1)** the tank never fully fills up (due to residual fuel and ambient temperature burn-offs); **2)** hydrogen stations are non-operational more often than operational; **3)** no new stations will be built; **4)** hydrogen prices will triple; **5)** only specially certified technicians at three dealerships in the entire state of California can service the Nexo, a fact that would have influenced Plaintiff's purchasing decision; **6)** the car is not good for the environment; **7)** the car has electrical issues; **8)** the car has no resale value; **9)** the car is not eligible for the tax credits Hyundai promises; and **10)** the car cannot be driven long distances.

35.    Due to the limited number of certified technicians, Plaintiff must travel over 60 miles from her residence in Sylmar to Tustin for vehicle service, as local Hyundai dealerships will not service the Nexo model.

36.    Plaintiff firsthand experienced this service limitation when Hyundai scheduled service appointments for her at its dealerships, yet upon arrival, she was turned away because the dealerships lacked Nexo-certified technicians. Hyundai failed to confirm service availability before scheduling these appointments, causing Plaintiff to waste time, incur unnecessary travel, and experience significant frustration.

37.    This failure highlights a broader issue—Hyundai corporate is fundamentally disconnected from its dealership network regarding the Nexo's service capabilities. When Plaintiff sought assistance, Hyundai corporate could not identify which dealerships were certified to service the Nexo or direct her to an appropriate service location. This systemic failure to coordinate its own service infrastructure demonstrates that Hyundai corporate knew or should have known it could not support the vehicles it was selling. Had Plaintiff been aware of Hyundai's inability to ensure even basic service availability, she would not have purchased the vehicle.

**COMPLAINT FOR DAMAGES**

<u>Vehicle Defects and Failed Repair Attempts</u>

38.     Since her purchase, the Vehicle exhibits substantial defects that impair its use, value, and safety. For example, the Vehicle's parking sensor system poses significant safety risks by deactivating without warning. One reason Plaintiff purchased a Nexo was for its advertised safety features, including breaking sensors and parking assist. Despite raising this serious safety concern at multiple service appointments, Defendant's technicians, including service manager Frank Marino, informed Plaintiff they could not fix this issue.

39.     The Vehicle's GPS navigation system routinely malfunctions by directing Plaintiff to hydrogen stations 200 miles away instead of nearby locations. Additionally, the Vehicle's Bluelink system (the GPS, safety features, and Bluetooth) has never functioned properly, and the Vehicle suffers from serious water intrusion issues at the tailgate and door sills, and persistent infotainment system defects.

40.     Plaintiff brought the Vehicle for repairs on March 5, 2024, May 14, 2024, July 30, 2024, and December 14, 2024. During the most recent repair attempt, the Vehicle remained at the dealership for over five weeks, from December 14, 2024, until January 21, 2025. Despite these repeated repair attempts, all defects persist.

<u>Safety Recalls and Threats</u>

41.     The Vehicle is subject to multiple safety recalls, including a critical issue involving the Vehicle's thermally-activated pressure relief device (TPRD). This faulty component creates a risk of hydrogen leakage and vehicle fire, leading Defendant Hyundai to instruct Plaintiff to park her Vehicle outdoors and away from any structures. In densely populated Los Angeles County, Plaintiff struggled to find suitable parking locations that complied with these safety requirements while she attempted to secure a service appointment.

**COMPLAINT FOR DAMAGES**

42.     When Plaintiff brought the Vehicle to the dealership for repairs in January of 2025, she learned that Hyundai had not yet developed a fix for the problem. The Vehicle remained at the dealership for several weeks while Hyundai worked on a solution, forcing Plaintiff to incur rental car expenses during this extended period. The combination of the serious safety risk, prolonged wait for a repair solution, and additional financial burden of a rental car exemplifies the ongoing challenges Plaintiff faces with Hyundai's inadequate service network, even for critical safety issues.

Systemic Fueling Infrastructure Issues

43.     The Vehicle is plagued by persistent fueling issues that render it impractical for daily use. Despite Hyundai's advertised 6.3 kilogram tank capacity, the Vehicle has achieved a complete fill fewer than four times since purchase. Typically, Plaintiff can only fill the tank to 60-80% of its capacity.

44.     Hydrogen fuel nozzles frequently jam onto the Vehicle during refueling, causing significant delays and safety concerns. These malfunctions have left Plaintiff stranded late at night, waiting for nozzles to unjam or thaw, creating serious safety concerns when she is alone with an empty tank.

45.     Despite Hyundai's representation that refueling takes approximately five minutes, hydrogen stations are not designed to support this timeline—a fact known to Hyundai. The California fueling standard, SAE J2601, mandates that stations must recompress hydrogen between refueling sessions, a process Hyundai knows takes over 30 minutes. Consequently, Plaintiff routinely waits about an hour to complete refueling and disconnect from the fuel pump, assuming fuel is even available. This delay contradicts Hyundai's marketing claims and makes routine refueling impractical for daily use.

**COMPLAINT FOR DAMAGES**

46.     On October 8, 2024, Plaintiff experienced a particularly dangerous incident at Defendant FirstElement's Mission Hills fuel station when the fuel pump nozzle became stuck on the Vehicle and continued dispensing fuel beyond the tank's capacity. This incident occurred around 1:00 AM, leaving Plaintiff stranded and distressed. Unlike gasoline, hydrogen fuel has no odor, leaving Plaintiff uncertain about the safety of her vehicle. She was forced to contact TruZero to have the nozzle removed from the Vehicle and determine if her car was safe to use.

47.     Contrary to Defendants' representations about convenience of the infrastructure, expanding nature of the infrastructure, and overall accessibility to stations, hydrogen fuel stations in California are consistently non-operational due to maintenance or supply issues. According to the Federal Department of Energy, the stations are down for maintenance more often than they are operational (not including outages for supply issues). Despite Hyundai's specific representations to Plaintiff at the point of sale that new hydrogen stations would soon open, no new stations have been built since Plaintiff's purchase. Instead, existing stations continue to permanently close, and promised new stations remain unbuilt. The cost of hydrogen fuel has also increased substantially (nearly doubled) since Plaintiff's purchase.

48.     Defendants Hyundai and FirstElement, as members of the California Hydrogen Fuel Cell Partnership, jointly participate in the hydrogen fuel industry's development. Hyundai approves all stations being built in California and has exclusive knowledge and data pertaining to fuel station availability and reliability in real time.  However, both Hyundai's in-car fuel map, and FirstElement's website, and their fuel cell partnership online map (h2fcp.org) consistently provide inaccurate information about fuel availability. Stations shown as operational are frequently non-functional upon Plaintiff's arrival. This unreliability has limited Plaintiff's travel range, preventing visits to friends and family. The Vehicle for these reasons cannot be driven on long distances.

**COMPLAINT FOR DAMAGES**

<u>Failed Buyback Attempts and Damages</u>

49.     Following numerous complaints to Hyundai corporate regarding the vehicle issues, on September 12, 2024, Defendant, through a case manager named Kourtnee, sent Plaintiff a repurchase offer letter. (See Exhibit B – September 2024 Repurchase Offer Letter)

50.     Plaintiff provided all requested documentation and followed up with case manager Kourtnee seeking updates on the promised buyback. As her Vehicle's registration was due in October, Plaintiff sought to have the buyback finalized to avoid additional costs. Despite numerous attempts to resolve this issue, she was met with delays and excuses from Hyundai. Following Kourtnee's assurance that registration costs would be reimbursed with the final buyback, Plaintiff paid the $852 registration fee in October 2024.

51.     After continued follow-up attempts with Defendant Hyundai were met with additional excuses regarding holiday delays, Defendant reaffirmed their repurchase offer as they sent another repurchase offer in writing invoking California's Lemon Law on December 20, 2024. (See Exhibit C – December 2024 Repurchase Offer Letter)

52.     However, on December 31, 2024, Defendant reversed its position on both offers, stating that based on their investigation "a repurchase is not warranted under the California Lemon Law." (See Exhibit D – Repurchase Recission Letter)

53.     In reliance on Defendant's buyback offers, Plaintiff spent every weekend visiting dealerships and approximately twelve hours per week researching replacement vehicles online. She maintained detailed records of her research through emails and calendar appointments with salespeople. This extensive car shopping process continued for months as previously identified vehicles became unavailable, requiring Plaintiff to restart her search repeatedly until Defendant ultimately reneged on the buyback offers.

**COMPLAINT FOR DAMAGES**

1

2                              Data Collection and Privacy Concerns

3

4      54.    Based on multiple correspondences from insurance companies and Hyundai's

5      opaque disclosures regarding data collection for the Nexo, the Vehicle collects an

6      alarming amount of personal data—including location tracking, driving habits, and

7      video and audio recordings. This personal data is sold to insurance companies, whose

8      interests are adverse to Plaintiff. Hyundai fails to disclose the extent of this personal

9      data harvest and sale to third parties at the time of purchase.

10

11                                Vehicle Status and Impact

12

13     55.    As of February 2025, the Vehicle has approximately 14,220 miles on the

14     odometer and exhibits all defects that have persisted since purchase.

15     56.    The resale value of the Nexo immediately drops to less than half its purchase

16     price upon delivery, a material fact known to Defendant Hyundai but concealed from

17     Plaintiff. Defendant continues to sell the Vehicle at full price while knowingly

18     concealing this dramatic depreciation from Plaintiff. The Vehicle's value has

19     depreciated so substantially that it is not only impractical to use but has become a

20     significant financial liability that would require Plaintiff to incur additional debt to

21     replace. This reveals that Defendant is selling a car under false promises, effectively

22     trapping Nexo owners who cannot obtain another car loan while still making

23     payments on this underwater Vehicle loan. This situation gravely impacts individuals

24     who have made one of their largest financial investments, and now find themselves

25     stuck with a rapidly depreciating asset, unable to secure another car loan to purchase

26     a replacement vehicle.

27     57.    Despite these widespread issues, Hyundai continues to sell the Nexo while

28     knowing that fuel stations are closing, and the infrastructure cannot support the

vehicle's basic operation. Furthermore, Defendant continues to advertise benefits, such as the CVRP rebate, that are not actually available to purchasers.

58.     In car-dependent California, owning the Nexo without reliable fuel access has become tortuous. Every journey requires extensive advance planning for fuel availability, and even basic errands become exercises in anxiety due to the constant risk of being stranded. The unreliability of the fueling infrastructure has left Plaintiff trapped in a cycle of disappointment and helplessness, unable to rely on her own vehicle in a state where personal transportation is essential. This daily battle has eroded Plaintiff's peace of mind, turning vehicle ownership into an exhausting ordeal that only deepens with each failed refueling attempt and worsens as stations permanently close.

59.     As a direct result of the Vehicle's defects, Plaintiff has incurred substantial damages, including: a. Ongoing monthly car payments for a vehicle she cannot reliably use; b. Registration fees of $852 paid in reliance on promised reimbursement; c. Increased insurance costs; d. Rental car expenses during extended repair periods; e. Loss of use of the Vehicle; f. Excessive fuel costs due to GPS navigation issues; g. Transportation expenses related to traveling to distant dealerships for service; h. Substantial time and resources spent searching for replacement vehicles based on false buyback promises; i. Lost opportunities to pursue alternative transportation options due to being trapped in the Vehicle's loan; j. Emotional distress from being stranded at fuel stations; k. Diminished quality of life from constant transportation uncertainty; and l. Strain on personal relationships due to the Vehicle's unreliability.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action on behalf of herself and all others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3).

**COMPLAINT FOR DAMAGES**

61.    The proposed Class is defined as: All persons or entities who purchased or leased a new or used Hyundai Nexo vehicle in California within four years prior to the filing of this Complaint through the date of class certification.

62.    Excluded from the Class are: (a) Defendants and their officers, directors, employees, principals, affiliated entities, controlling entities, agents, and other affiliates; (b) the judges and court personnel in this case and any members of their immediate families; and (c) all governmental entities.

63.    The proposed Class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3):

64.    Numerosity: The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time, upon information and belief, there are at least hundreds of purchasers and lessees of Hyundai Nexo vehicles in California. The precise number of Class members can be ascertained through discovery, including Defendants' sales records.

65.    Commonality: The Class claims raise questions of law and fact common to all Class members that will generate common answers apt to drive resolution of the litigation. These common questions include whether Defendants misrepresented the capabilities and limitations of the Nexo hydrogen fuel system; whether Defendants failed to disclose material facts about the Nexo's fueling limitations and infrastructure; whether these misrepresentations and omissions violated California consumer protection laws; whether Class members suffered damages as a result of Defendants' conduct; and the proper measure of such damages. The answers to these questions will be the same for all Class members.

66.    Typicality: Plaintiff's claims are typical of Class members' claims as they arise from the same course of conduct by Defendants and are based on the same legal theories. Like all Class members, Plaintiff purchased a Nexo vehicle in California based on Defendants' misrepresentations about its capabilities and infrastructure support, and suffered damages when these representations proved false. The factual

- 15 -
**COMPLAINT FOR DAMAGES**

bases of Defendants' misconduct are common to all Class members and will result in injury to all Class members if Defendants' conduct is not halted.

67.     Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of other Class members and has retained counsel experienced in consumer class actions.

## FIRST CAUSE OF ACTION

### Fraud

*(Against Defendant Hyundai)*

68.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

69.     Prior to Plaintiff's purchase, Hyundai engaged in a pattern of material misrepresentations about the Vehicle. Sales representative Rick Majors falsely promised Plaintiff would be eligible to receive a $7,500 Clean Vehicle Rebate Project incentive, which she has never received. Marketing materials claim the Nexo can achieve a full 6.3 kilogram tank capacity, when in reality the Vehicle has achieved a complete fill fewer than five times since purchase. Further, Majors promised an expanding network of hydrogen fuel stations would support Nexo owners, while knowing stations were actually closing.

70.     Through various promotional materials and sales presentations, Hyundai represents that refueling takes approximately five minutes, deliberately concealing that the California fueling standard SAE J2601 requires a 30+ minute recompression period between refueling sessions, resulting in hour-long refueling delays. The sales team assured Plaintiff the Vehicle could be easily serviced, while knowingly concealing that only specially certified technicians at select dealerships can perform maintenance.

71.    The company touts the Vehicle's GPS and Bluelink systems as providing accurate fuel station information when these systems consistently malfunction by directing Plaintiff to distant or non-operational stations. Marketing campaigns promote the Vehicle as eco-friendly, even though every step of hydrogen production and storage is more harmful to the environment compared to gasoline or electric batteries. Most egregiously, Hyundai fails to disclose that the Vehicle extensively collects personal data including location tracking, driving habits, and audio/video recordings, which it then sells to third parties including insurance companies.

72.    Beyond these misrepresentations, Hyundai conceals material facts about the Vehicle's severe limitations. While marketing the Nexo as practical for daily use, the company knows the hydrogen refueling infrastructure remains severely limited and unreliable. The company fails to inform potential buyers that only specially certified technicians at select dealerships can service the Nexo, forcing Plaintiff to travel over 60 miles for basic repairs. Hyundai withholds critical safety information from consumers, including that fuel nozzles frequently jam during refueling, creating serious safety hazards, and that the Vehicle's parking sensor system deactivates without warning. The company also conceals known design flaws, including serious water intrusion issues at the tailgate and door sills that persist in the Vehicle.

73.    After Plaintiff experienced numerous issues with the Vehicle and complained to Hyundai corporate, Defendant's case manager Kourtnee, on September 12, 2024, acknowledged the Vehicle's defects and problems and sent Plaintiff a repurchase offer letter. Subsequently, on December 20, 2024, Defendant sent another repurchase offer under California's Lemon Law. However, on December 31, 2024, Defendant inexplicably reversed its position on both offers.

74.    Defendant's conduct in offering and then reneging on two separate buyback offers demonstrates both its knowledge of the Vehicle's substantial defects and its intent to deceive Plaintiff. These actions caused Plaintiff additional damage, as Plaintiff spent considerable time searching for a replacement vehicle in reliance on

Defendant's buyback offers, but was unable to proceed with a replacement purchase due to the inability to maintain two car loans simultaneously after Defendant reneged on its offers.

75.     The material facts about the Vehicle's defects and limitations were not within Plaintiff's reasonably diligent attention, observation, or judgment at the time of purchase. Defendant had knowledge of these material facts and actively concealed them with the intention that Plaintiff would rely on their misrepresentations in deciding to purchase the Vehicle.

76.     In purchasing the Vehicle, Plaintiff justifiably relied on Defendant's representations regarding the promised $7,500 CVRP incentive, the ease and reliability of refueling, the expansion of hydrogen infrastructure, the Vehicle's reliability and serviceability, the environment benefits of hydrogen fueling, and the accuracy of fuel station location information. These representations were material to her purchase decision.

77.     As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff has suffered substantial damages, including monetary losses from the Vehicle purchase, rental car expenses, increased insurance costs, transportation expenses, loss of vehicle use, emotional distress, and substantial diminution in the Vehicle's value. Plaintiff has also suffered additional damages from Defendant's fraudulent conduct regarding the buyback offers, including wasted time and resources searching for replacement vehicles and the continued financial burden of payments on an essentially unusable vehicle.

78.     Defendant's conduct in making and then reneging on multiple buyback offers was malicious, oppressive, and in conscious disregard of Plaintiff's rights, warranting the imposition of punitive damages.

## SECOND CAUSE OF ACTION

**COMPLAINT FOR DAMAGES**

## Breach of Express Warranty - Song-Beverly Consumer Warranty Act

*(Against Defendant Hyundai)*

79.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

80.     The Vehicle constitutes a "consumer good" under Cal. Civ. Code § 1791(a), purchased primarily for personal, family, or household purposes.

81.     Under the Song-Beverly Consumer Warranty Act, Defendant expressly warranted the Vehicle's hydrogen fuel tank capacity of 6.3 kilograms through written materials provided at purchase, advertising and marketing materials, website content, and the Vehicle's specifications and owner's manual.

82.     The Vehicle consistently fails to meet its express warranty of 6.3 kilogram fuel tank capacity. Since purchase, the Vehicle has achieved a complete fill fewer than four times, typically reaching only 60-80% of its warranted capacity. This defect directly impacts the Vehicle's range, requiring more frequent refueling stops and increasing the risk of being stranded due to fuel depletion.

83.     Beyond the fuel capacity defect, the Vehicle exhibited other substantial defects within the warranty period that significantly impair its use, value, and safety. These defects include malfunctioning parking sensors that deactivate without warning, creating significant safety risks. The Vehicle's GPS navigation system is defective, routinely providing incorrect fuel station information and directing Plaintiff to stations hundreds of miles away instead of nearby locations. The Vehicle suffers from serious water intrusion issues at the tailgate and door sills, a completely non-functional Bluelink system, and persistent infotainment system defects that impair basic vehicle operations.

84.     Between March 2024 and January 2025, Plaintiff delivered the Vehicle for warranty repairs on March 5, 2024, May 14, 2024, July 30, 2024, and December 14, 2024 through January 21, 2025. Despite four separate repair attempts, including a

final repair period that kept the Vehicle at the dealership for over five weeks, all defects persist. These repeated unsuccessful repair attempts, coupled with the extensive time the Vehicle has been out of service, demonstrate that Defendant has failed to conform the Vehicle to the warranties after a reasonable number of repair opportunities in violation of Cal. Civ. Code § 1793.2(d). Particularly egregious is that following this extended repair period, all original defects persist, demonstrating the futility of further repair attempts.

85.    As a direct result of Defendant's breach of express warranty, Plaintiff has suffered substantial damages including loss of use of the Vehicle, increased fuel and transportation costs including ongoing monthly car payments, rental car expenses, lost time and inconvenience seeking repairs and fuel, increased insurance costs, and substantial diminution in value of the Vehicle.

86.    Under the Song-Beverly Consumer Warranty Act, Plaintiff is entitled to restitution or replacement of the Vehicle, incidental and consequential damages, civil penalties up to two times the amount of actual damages, and reasonable attorney fees and costs.

## THIRD CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability - Song-Beverly Consumer Warranty Act

*(Against Defendant Hyundai)*

87.    The Vehicle was sold with an implied warranty of merchantability pursuant to Cal. Civ. Code §§ 1791.1 and 1792. This warranty guarantees that the Vehicle would be fit for ordinary transportation purposes, adequately contained and packaged, properly labeled, and conform to the promises made in Defendant's marketing. Such an implied warranty is barred from modification or disclaimer under Cal. Civ. Code §§ 1793.22(e)(2).

**COMPLAINT FOR DAMAGES**

88.    The Vehicle fundamentally fails to meet these basic requirements in the following ways:

89.    The Vehicle cannot be reliably refueled, as evidenced by its consistent inability to achieve more than 60-80% of its advertised fuel capacity;

90.    On October 8, 2024, the fuel pump nozzle became stuck and continued dispensing fuel beyond capacity, creating a serious safety hazard;

91.    The Vehicle cannot be serviced at more than one dealership within a 100 mile radius, requiring Plaintiff to travel over 60 miles for basic maintenance;

92.    The Vehicle's parking sensor system poses significant safety risks by deactivating without warning;

93.    The Vehicle's GPS navigation system routinely malfunctions by directing Plaintiff to hydrogen stations 200 miles away instead of nearby locations;

94.    The Vehicle suffers from serious water intrusion issues at the tailgate and door sills.

95.    The Vehicle further fails as a means of transportation. Plaintiff purchased this Vehicle with the reasonable expectation that it could feasibly be refueled and serviced. When a passenger vehicle cannot be readily and feasibly refueled and serviced, its fundamental function of transporting people is completely undermined.

96.    Service limitations render the Vehicle unmerchantable, as only specially certified technicians at select dealerships can perform maintenance. This has resulted in Plaintiff traveling excessive distances for basic maintenance and repairs, and being turned away from multiple service appointments at dealerships that lack Nexo-certified technicians, despite these appointments being scheduled by Defendant Hyundai.

97.    These defects substantially impair the Vehicle's use, value, and safety, rendering it unmerchantable under Cal. Civ. Code § 1791.1. All of these defects and nonconformities were present at the time of purchase or lease of the Vehicle, extending the duration of any implied warranty under governing case law.

- 21 -
**COMPLAINT FOR DAMAGES**

98.    Plaintiff is entitled to justifiably revoke acceptance of the Vehicle under Cal.
Civ. Code § 1794 et seq. Plaintiff hereby revokes acceptance of the Vehicle.

99.    Plaintiff is entitled to replacement or reimbursement pursuant to Cal. Civ.
Code § 1794 et seq., including all incidental, consequential, and general damages
resulting from Defendant's violations of the Song-Beverly Act.

100.    Defendant's willful violations of the Song-Beverly Act entitle Plaintiff to civil
penalties of up to two times actual damages, costs, and attorney's fees.


## FOURTH CAUSE OF ACTION

### Violations of Consumer Legal Remedies Act (Cal. Civ. Code § 1750 et seq.)

*(Against Defendant Hyundai)*

*(Injunctive Relief Only)*


101.    Plaintiff incorporates by reference all preceding paragraphs as though fully set
forth herein.

102.    Concurrent with the filing of this action, pursuant to Cal. Civ. Code § 1782(d),
Plaintiff is providing Defendant with written notice of Defendant's violations of Cal.
Civ. Code § 1770 and demanding that Defendant rectify the problems associated with
the actions described above. Following the expiration of the 30-day notice period,
Plaintiff will amend this complaint to add claims for monetary damages under the
CLRA.

103.    The CLRA provides nonexclusive statutory remedies for unfair methods of
competition and unfair or deceptive acts undertaken by any person in a transaction
intended to result in the sale of goods to any consumer.

104.    Defendant violated Cal. Civ. Code § 1770(a)(5) by misrepresenting the
Vehicle's characteristics, uses, benefits, and qualities. Hyundai falsely advertises the
Vehicle as having a 6.3 kilogram fuel tank capacity, yet it consistently fails to
achieve this capacity in real-world conditions. Defendant promotes an expanding

network of hydrogen fuel stations while knowing stations are closing rather than expanding. The company lures consumers with promises of a $7,500 rebate that remains unfulfilled while concealing the limited service availability, which requires specially certified technicians at select dealerships. Most misleadingly, the company markets the Vehicle as an eco-friendly transportation solution while concealing that hydrogen fuel production and storage causes three times more environmental harm than any other fuel source. These representations are particularly deceptive when paired with Hyundai's claims about five-minute refueling times, which ignore the mandatory 30-minute recompression period between refueling sessions required by California fueling standard SAE J2601. Additionally, Hyundai fails to disclose its extensive collection and sale of users' personal data, including location tracking, driving habits, and audio/video recordings, to third parties such as insurance companies.

105.   Defendant violated Cal. Civ. Code § 1770(a)(7) by falsely representing the Vehicle's standard, quality, and grade. Hyundai aggressively markets the Nexo as a practical eco-friendly vehicle comparable to conventional vehicles, claiming similar ease of fueling and service accessibility. In reality, the Vehicle is fundamentally unsuited for ordinary consumer use, requiring hour-long refueling sessions due to mandatory recompression periods, specialized service technicians available only at select dealerships, and reliance on an unreliable and shrinking hydrogen fuel infrastructure. Hyundai's representations of the Vehicle as meeting conventional vehicle standards are particularly misleading given its extensive data collection practices, persistent safety issues with fuel nozzle malfunctions, and complete dependence on a prototype refueling network that routinely fails to provide even basic fueling services.

106.   Defendant violated Cal. Civ. Code § 1770(a)(9) by advertising the Vehicle with intent not to sell it as advertised, particularly regarding its fuel capacity, refueling time, and service availability.

107.   Defendant violated Cal. Civ. Code § 1770(a)(14) by representing that the transaction involves rights and remedies it knows are substantially unavailable to the consumer, specifically regarding the promised $7,500 rebate and warranty service accessibility.

108.   Defendant violated Cal. Civ. Code § 1770(a)(16) by representing that the subject of the transaction has been supplied in accordance with a previous representation when it has not, particularly regarding the Vehicle's fuel capacity, environmental benefits, and practicality for daily use.

109.   These misrepresentations are particularly deceptive when paired with Hyundai's claims about five-minute refueling times, which ignore the mandatory 30-minute recompression period between refueling sessions required by California fueling standard SAE J2601. Additionally, the company fails to disclose its extensive collection and sale of users' personal data, including location tracking, driving habits, and audio/video recordings, to third parties such as insurance companies.

110.   These violations are further aggravated by Defendant's systematic pattern of material omissions. While making affirmative misrepresentations about the Vehicle's capabilities, Defendant deliberately suppressed crucial facts within its knowledge but unknown to consumers, including: the mandatory 30-minute recompression period between refueling sessions under SAE J2601, the extensive collection and sale of users' personal data to third parties, the severely limited availability of certified service technicians, the true cost of hydrogen fuel, and the declining rather than expanding infrastructure.

111.   Defendant's pattern of deceptive conduct culminated in its offers to repurchase the Vehicle in September and December 2024, only to inexplicably renege on both offers by December 31, 2024. This reversal left Plaintiff in a substantially worse position, having spent months researching replacement vehicles and foregoing other transportation alternatives in reliance on Defendant's promises.

**COMPLAINT FOR DAMAGES**

112.   Pursuant to Cal. Civ. Code § 1780(a)(2), Plaintiff seeks injunctive relief to prevent Defendant's ongoing violations of the CLRA, including but not limited to an order requiring Defendant to cease its false advertising regarding the Nexo's capabilities and fuel availability, and to fully disclose the limitations of hydrogen fuel cell vehicles to prospective purchasers.

113.   Following the expiration of the 30-day notice period required by Cal. Civ. Code § 1782, Plaintiff will amend this complaint to seek monetary damages, restitution, punitive damages, and attorneys' fees and costs pursuant to Cal. Civ. Code § 1780.

## FIFTH CAUSE OF ACTION

### False Advertising (Business & Professions Code § 17500)

*(Against Defendant Hyundai)*

114.   Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

115.   Defendant knowingly made or disseminated untrue or misleading statements to induce the public to enter obligations relating to the Vehicle, in violation of Business and Professions Code § 17500.

116.   Defendant made untrue or misleading statements regarding the Vehicle's reliability, environmental benefits, fuel availability, service network, and refueling capabilities. These statements included representations about hydrogen fuel accessibility, the expansion of fueling infrastructure, ease of refueling, and the Vehicle's practical usability for daily transportation.

117.   The false and misleading marketing campaign for the Vehicle included promises of a $7,500 CVRP incentive that never materialized and claims about a 6.3 kilogram fuel capacity that has proven consistently impossible to achieve. Despite knowing that hydrogen fueling stations were closing, marketing materials touted an expanding network of fueling locations. Claims of widespread service availability

masked the reality that only select dealerships could service the Vehicle. Most egregiously, the Vehicle was marketed as practical for daily transportation while concealing the severe infrastructure limitations that make regular operation nearly impossible.

118.    Defendant knew or should have known through the exercise of reasonable care that these representations were untrue or misleading when made. Defendant was aware that the hydrogen fueling infrastructure was prototype technology that frequently failed, that existing stations were closing rather than expanding, and that only a fraction of dealerships could service the Vehicle.

119.    Plaintiff relied on these misrepresentations in deciding to purchase the Vehicle and suffered damages as a result of this reliance, including the purchase price, registration fees of $852 paid based on promised reimbursement, significant transportation expenses for distant dealership service, and loss of vehicle use due to the unreliable fueling infrastructure.


### SIXTH CAUSE OF ACTION

**Unfair Competition (Business & Professions Code §17200 et seq.)**

*(Against All Defendants)*

120.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

121.    Defendants' conduct constitutes "unlawful" business practices under § 17200 through violations of the Song-Beverly Act, CLRA, and False Advertising Law as alleged above, as well as violations of California's data privacy laws through their undisclosed collection and sale of personal data.

122.    Defendants' conduct constitutes "unfair" business practices as their actions cause substantial harm to consumers that outweighs any possible benefits. These practices include: concealing and misrepresenting the mandatory 30-minute

recompression period required by SAE J2601 between refueling sessions; collecting and selling users' personal data including location tracking, driving habits, and audio/video recordings to third parties whose interests are adverse to consumers; promoting an expanding fuel network while stations are closing; and making and reneging on multiple buyback offers after acknowledging the Vehicle's defects. Such conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

123.  Defendants' conduct constitutes "fraudulent" business practices through their systematic deceptive marketing of the Vehicle and hydrogen fuel infrastructure. This includes falsely advertising five-minute refueling times while knowing the SAE J2601 standard makes this impossible, concealing their extensive data collection and sale practices, and promoting a supposedly expanding hydrogen infrastructure while stations continue to close. These misrepresentations and omissions were likely to deceive members of the public and did in fact deceive Plaintiff.

124.  As a direct result of Defendants' violations of § 17200, Plaintiff has suffered injury in fact and lost money or property, including the purchase price of the Vehicle, registration and licensing fees, repair and maintenance costs, excess fuel costs, transportation expenses, and loss of use of the Vehicle.

**SEVENTH CAUSE OF ACTION**

**Negligence**

*(Against All Defendants)*

125.  Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

126.  Under California law, Defendants owed Plaintiff a duty of reasonable care in providing accurate information about fuel availability, maintaining functional fueling infrastructure, ensuring proper Vehicle servicing capability, providing accurate

information about service availability, providing accurate information about environmental effects of hydrogen fueling, and maintaining safe refueling equipment.

127.    Defendants breached these duties by providing inaccurate fuel availability information, failing to maintain adequate infrastructure, concealing the limited availability of qualified service technicians, operating defective fuel pumps that created safety hazards, and failing to disclose the extent of personal data collection from Vehicle users. These actions constitute a breach of the standard of care required under California law.

128.    As a direct and proximate result of Defendants' negligence, Plaintiff has suffered monetary losses, loss of Vehicle use, and excessive time spent seeking fuel and service.

129.    These damages were reasonably foreseeable consequences of Defendants' breach of duty as Defendants knew or should have known that inaccurate fuel availability information would strand consumers, limited service availability would create excessive burdens, defective refueling equipment would create safety hazards, and inadequate infrastructure would render the Vehicle impractical for daily use.

### EIGHTH CAUSE OF ACTION

**Magnuson-Moss Warranty Act (15 U.S.C. § 2301 et seq.)**

*(Against Defendant Hyundai)*

130.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

131.    This claim arises under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., entitling Plaintiff to recover her actual damages, consequential damages, and attorneys' fees and costs.

132.    The Vehicle, with a total sales price of $71,493.98, is a "consumer product" as defined by 15 U.S.C. § 2301(1).

**COMPLAINT FOR DAMAGES**

133.   Plaintiff is a "consumer" as defined by 15 U.S.C. § 2301(3) because she purchased the Vehicle for personal, family, and household purposes.

134.   Defendant is a "supplier" and "warrantor" as defined by 15 U.S.C. §§ 2301(4) and (5) because it regularly deals in and is engaged in the business of selling the Vehicle and provided express and implied warranties for the Vehicle.

135.   The Vehicle came with written warranties as defined by 15 U.S.C. § 2301(6), including express warranties regarding the Vehicle's fuel tank capacity of 6.3 kilograms, promises that refueling would take approximately five minutes, assurances about the expansion and reliability of the hydrogen fueling infrastructure, warranties about the Vehicle's GPS navigation system, Bluelink system, and parking sensors, and warranties about service availability and maintenance.

136.   Defendant breached these written warranties by delivering a Vehicle that consistently fails to achieve its warranted 6.3 kilogram fuel tank capacity, typically reaching only 60-80% capacity, providing refueling that routinely takes an hour or more rather than the promised five minutes due to the mandatory 30-minute recompression period required by California fueling standard SAE J2601, failing to maintain or expand the promised hydrogen fueling infrastructure, delivering a Vehicle with non-functional GPS navigation, Bluelink systems, and unreliable parking sensors, and failing to provide adequate service access, with only three qualified dealerships in California.

137.   The Vehicle also came with implied warranties as defined by 15 U.S.C. § 2301(7). Defendant breached these implied warranties by providing a Vehicle that cannot be reliably refueled, with fuel pump nozzles that routinely jam and create safety hazards, failing to provide reasonable access to service and maintenance, delivering a Vehicle with persistent safety defects including malfunctioning parking sensors, and providing a Vehicle that fundamentally fails as a means of practical transportation.

**COMPLAINT FOR DAMAGES**

138.   Plaintiff afforded Defendant reasonable opportunities to cure these defects through multiple repair attempts between March 2024 and January 2025, specifically on March 5, 2024, May 14, 2024, July 30, 2024, and December 14, 2024 through January 21, 2025. Despite these multiple repair attempts, including a final repair period exceeding five weeks, all defects persist, demonstrating that Defendant is unable or unwilling to repair the Vehicle within a reasonable number of attempts.

139.   Defendant's failure to cure these defects after a reasonable opportunity causes the warranties to fail of their essential purpose, entitling Plaintiff to revoke her acceptance of the Vehicle. Plaintiff provided Defendant written notice and reasonable opportunity to cure the breaches of warranty, including through multiple service visits and direct communications with Defendant's corporate office.

140.   As a direct and proximate result of Defendant's breaches of written and implied warranties, Plaintiff has suffered damages including the total sales price of $71,493.98, finance charges and interest, registration fees of $852, insurance premiums, rental car expenses during repair periods, transportation costs to distant dealerships, excess fuel costs due to navigation issues, loss of use of the Vehicle, and substantial diminution in the Vehicle's value.

141.   The amount in controversy exceeds $50,000, exclusive of interest and costs, based on the total sales price of $71,493.98 alone, not including other damages, civil penalties, or attorney's fees.

142.   Pursuant to 15 U.S.C. § 2310(d), Plaintiff is entitled to revocation of acceptance and return of the purchase price, compensatory damages, consequential and incidental damages, attorneys' fees and costs, and other legal and equitable relief as the Court deems appropriate.

### NINTH CAUSE OF ACTION
### CLAIM FOR INJUNCTIVE RELIEF
*(Against Defendant Gavin Newsom)*

COMPLAINT FOR DAMAGES

143.   Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

144.   Governor Newsom dispenses over twenty million taxpayer dollars annually to fund hydrogen infrastructure schemes that pollute the environment and exploit citizens. For example, the California Energy Commission provided $1,451,000 for each True Zero / FirstElement hydrogen fuel station, yet each station closes within eighteen months.

145.   The California government under Newsom continues to waste millions of dollars annually and is slated to continue this practice for decades to come. For instance, the Governor published a projection for 200 hydrogen stations in 2025, and plans to spend 200 million dollars on a new projection for 179 stations in 2027, yet there are less than 36 active stations to date.

146.   The Los Angeles Department of Transportation has openly declared that these hydrogen fuel efforts harm the environment rather than help it. Despite this, Newsom continues funding a program that actively harms the environmental goals it purports to advance.

147.   The Governor has provided and continues to provide millions of dollars to FirstElement to build and maintain hydrogen fuel stations that demonstrably fail. These stations shut down within a year with no accountability for the wasted taxpayer funds.

148.   Absent injunctive relief:

    a.   The state will continue to waste hundreds of millions in taxpayer dollars on failed infrastructure;

    b.   Environmental harm will increase as more polluting hydrogen infrastructure is funded;

    c.   The public will continue to be misled about the viability of hydrogen fuel cell vehicles.

149.   Plaintiff seeks an order:

**COMPLAINT FOR DAMAGES**

      a.  Enjoining Governor Newsom from allocating any additional state funds to hydrogen fuel infrastructure projects;

      b.  Requiring immediate cessation of all current state funding for hydrogen infrastructure projects;

      c.  Prohibiting the inclusion of hydrogen infrastructure funding in future state budgets absent proof of commercial viability and environmental benefit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For rescission of the purchase agreement and restitution of all monies expended, including but not limited to:

      a.  Return of the purchase price of $71,493.98;

      b.  All registration fees, licensing fees, and taxes paid;

      c.  All finance charges and interest paid;

      d.  All insurance premiums paid; and

      e.  All fuel, maintenance, and repair costs incurred;

OR, IN THE ALTERNATIVE:

2. For compensatory damages in an amount to be proven at trial, including but not limited to:

      a.  The difference in value between the Vehicle as represented and as actually received;

      b.  All incidental and consequential damages;

      c.  Loss of use damages;

      d.  Transportation and rental car expenses;

      e.  Repair and maintenance costs; and

      f.  Diminution in value of the Vehicle;

**COMPLAINT FOR DAMAGES**

3.  For statutory damages and civil penalties as provided by:

    a.  The Song-Beverly Consumer Warranty Act;

    b.  The Consumer Legal Remedies Act; and

    c.  Other applicable statutes;

4.  For punitive damages as permitted by law;

5.   For preliminary and permanent injunctive relief, including but not limited to:

    a.  Enjoining Governor Newsom from allocating additional state funds to hydrogen fuel infrastructure projects absent a formal, independent regulatory review;

    b.  Requiring Defendants to cease misrepresentations about hydrogen fuel availability and vehicle performance;

6.  For prejudgment and post-judgment interest as provided by law;

7.  For reasonable attorneys' fees and costs of suit as provided by:

    a.  The Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1794(d);

    b.  The Consumer Legal Remedies Act, Cal. Civ. Code § 1780(e);

    c.  The Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d); and

    d.  Any other applicable statute;

8.  For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

Dated: February 21, 2025         INGBER LAW GROUP

By: */s/ Jason M. Ingber*
Jason M. Ingber (SBN 318323)
3580 Wilshire Blvd., Suite 1260
Los Angeles, California 90010
Tel: (213) 805-8373
Email: ji@jasoningber.com
Attorney for Plaintiff

**COMPLAINT FOR DAMAGES**

# EXHIBIT A

iLAW 553-CA-ARB-ea 3/23

10/6/2023

## RETAIL INSTALLMENT SALE CONTRACT – SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION)

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Seller-Creditor (Name and Address) |
|---|---|---|
| STACY ROSS<br>Sylmar, CA 91342 LOS ANGELES<br>Cell: XXXXXXXX<br>Email: XXXXXXXX | LORNA ROSS<br>El Segundo, CA 90245 LOS ANGELES<br>Cell XXXXXXXX<br>Email: XXXXXXXX | PB AND J AUTOMOTIVE INC<br>16 AUTO CENTER DRIVE<br>TUSTIN, CA 92782 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements in this contract. You agree to pay the Seller – Creditor (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| New | 2023 | Hyundai NEXO | 36 | KM8J84A67PU035589 | Personal, family, or household unless otherwise indicated below<br>☐ business or commercial |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. | Total Sale Price<br>The total cost of your purchase on credit, including your down payment of $ 40,534.52 is |
|---|---|---|---|---|
| 0.00 % | $ 0.00 (e) | $ 30,959.46 (e) | $ 30,959.46 (e) | $ 71,493.98 (e) |

(e) means an estimate

**YOUR PAYMENT SCHEDULE WILL BE:**

| Number of Payments: | Amount of Payments: | When Payments Are Due: |
|---|---|---|
| One Payment of | $ N/A | N/A |
| One Payment of | $ N/A | N/A |
| One Payment of | $ N/A | N/A |
| 71 Payments | $ 429.99 | Monthly beginning 11/20/2023 |
| N/A | $ N/A | N/A |
| One final payment | $ 430.17 | 10/20/2029 |

**Late Charge.** If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.
**Prepayment.** If you pay early, you may be charged a minimum finance charge.
**Security Interest.** You are giving a security interest in the vehicle being purchased.
**Additional Information:** See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, minimum finance charges, and security interest.

### STATEMENT OF INSURANCE

**NOTICE.** No person is required as a condition of financing the purchase of a motor vehicle to purchase or negotiate any insurance through a particular insurance company, agent or broker. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

#### Vehicle Insurance

| | Term | Premium |
|---|---|---|
| $ N/A Ded. Comp., Fire & Theft | N/A Mos. | $ N/A |
| $ N/A Ded. Collision | N/A Mos. | $ N/A |
| Bodily Injury $ N/A Limits | N/A Mos. | $ N/A |
| Property Damage $ N/A Limits | N/A Mos. | $ N/A |
| Medical N/A | N/A Mos. | $ N/A |
| N/A | N/A Mos. | $ N/A |
| Total Vehicle Insurance Premiums | | $ N/A |

UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.

You may buy the physical damage insurance this contract requires from anyone you choose who is acceptable to us. You may also provide the physical damage insurance through an existing policy owned or controlled by you that is acceptable to us. You are not required to buy any other insurance to obtain credit.

| Buyer X A | STACY ROSS |
|---|---|
| Co-Buyer X A | LORNA ROSS |
| Seller X A | BAYAR KHOKHAR |

**Trade-In Payoff Agreement:** Seller relied on information from you and/or the lienholder or lessor of your trade-in vehicle(s) to arrive at the payoff amount shown as the Prior Credit or Lease Balance in Trade-In Vehicle(s). You understand that the amount quoted is an estimate. Seller agrees to pay the payoff amount shown as the Prior Credit or Lease Balance in Trade-In Vehicle(s) to the lienholder or lessor of the trade-in vehicle(s), or its designee. If the actual payoff amount is more than the amount shown as the Prior Credit or Lease Balance in Trade-In Vehicle(s), you must pay the Seller the excess on demand. If the actual payoff amount is less than the amount shown as the Prior Credit or Lease Balance in Trade-In Vehicle(s), Seller will refund to you any overage Seller receives from your prior lienholder or lessor. Except as stated in the 'NOTICE' on page 5 of this contract, any assignee of this contract will not be obligated to pay the Prior Credit or Lease Balance shown in Trade-In Vehicle(s) or any refund. You agree to sign or provide any documents Seller reasonably requires to effect the transfer of the Trade-In Vehicle to Seller or its designee.

| Buyer Signature X B | STACY ROSS | Co-Buyer Signature X B | LORNA ROSS |
|---|---|---|---|

### AUTO BROKER FEE DISCLOSURE
If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:
☐ Name of autobroker receiving fee, if applicable: _____ N/A _____

**Agreement to Arbitrate:** By signing below, you agree that, pursuant to the Arbitration Provision on page 5 of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate.

| Buyer Signs X C | STACY ROSS | Co-Buyer Signs X C | LORNA ROSS |
|---|---|---|---|

T820921067-DP820921068 - THIS IS A CUSTOMER COMPLETED COPY OF THE SIGNED ELECTRONIC FORM HELD BY DEALER

**ITEMIZATION OF THE AMOUNT FINANCED** (Seller may keep part of the amounts paid to others)

**1. Total Cash Price**

| | | |
|---|---|---|
| A. Cash Price of Motor Vehicle and Accessories | $ | 62,420.00 (A) |
|   1. Cash Price Vehicle | $ 62,420.00 | |
|   2. Cash Price Accessories | $ N/A | |
|   3. Other (Nontaxable) Describe N/A | $ N/A | |
|   4. Other (Nontaxable) Describe N/A | $ N/A | |
| B. Document Processing Charge (not a governmental fee) | $ | 85.00 (B) |
| C. Emissions Testing Charge (not a governmental fee) | $ | N/A (C) |
| D. (Optional) Theft Deterrent Device(s) | | |
|   1. (paid to) N/A | $ | N/A (D1) |
|   2. (paid to) N/A | $ | N/A (D2) |
|   3. (paid to) N/A | $ | N/A (D3) |
| E. (Optional) Surface Protection Product(s) | | |
|   1. (paid to) N/A | $ | N/A (E1) |
|   2. (paid to) N/A | $ | N/A (E2) |
| F. EV Charging Station (paid to) N/A | $ | N/A (F) |
| G. Sales Tax (on taxable items in A through F) | $ | 5,937.98 (G) |
| H. Electronic Vehicle Registration or Transfer Charge (not a governmental fee) (paid to) AVRS | $ | 22.00 (H) |
| I. (Optional) Service Contract(s) | | |
|   1. (paid to) NAAC | $ | 2,300.00 (I1) |
|   2. (paid to) N/A | $ | N/A (I2) |
|   3. (paid to) N/A | $ | N/A (I3) |
|   4. (paid to) N/A | $ | N/A (I4) |
|   5. (paid to) N/A | $ | N/A (I5) |
| J. Prior Credit or Lease Balance (e) paid by Seller to USAA | $ | N/A (J) |
|   (see downpayment and trade-in calculation) | | |
| K. Prior Credit or Lease Balance (e) paid by Seller to N/A | $ | N/A (K) |
|   (see downpayment and trade-in calculation) | | |
| L. (Optional) Debt Cancellation Agreement or Guaranteed Asset Protection Waiver | $ | N/A (L) |
| M. (Optional) Used Vehicle Contract Cancellation Option Agreement | $ | N/A (M) |
| N. Other paid to N/A For N/A | $ | N/A (N) |
| O. Other paid to N/A For N/A | $ | N/A (O) |
| **Total Cash Price** (A through O) | $ | 70,764.98 (1) |

**2. Amounts Paid to Public Officials**

| | | |
|---|---|---|
| A. Vehicle License Fees | $ | 406.00 (A) |
| B. Registration/Transfer/Titling Fees | $ | 316.00 (B) |
| C. California Tire Fees | $ | 7.00 (C) |
| D. Other N/A | $ | N/A (D) |
| **Total Official Fees** (A through D) | $ | 729.00 (2) |

**3. Amount Paid to Insurance Companies** (Total premiums from Statement of Insurance) $ N/A (3)

**4.** ☐ State Emissions Certification Fee or ☐ State Emissions Exemption Fee  $ N/A (4)

**5. Subtotal** (1 through 4)  $ 71,493.98 (5)

**6. Total Downpayment**

| | | |
|---|---|---|
| A. Total Agreed Value of Property Being Traded-In (see Trade-In Vehicle(s)): | $ | 19,500.00 (A) |
|   Vehicle 1 $ 19,500.00    Vehicle 2 $ N/A | | |
| B. Total Less Prior Credit or Lease Balance (e) | $ | 14,565.48 (B) |
|   Vehicle 1 $ 14,565.48    Vehicle 2 $ N/A | | |
| C. Total Net Trade-In (A–B) | $ | 4,934.52 (C) |
|   Vehicle 1 $ 4,934.52    Vehicle 2 $ N/A | | |
| D. Deferred Downpayment Payable to Seller | $ | N/A (D) |
| E. Manufacturer's Rebate | $ | 33,000.00 (E) |
| F. Other N/A | $ | N/A (F) |
| G. Other N/A | $ | N/A (G) |
| H. Other N/A | $ | N/A (H) |
| I. Cash, Cash Equivalent, Check, Credit Card, or Debit Card | $ | 2,600.00 (I) |
| **Total Downpayment** (C through I) | $ | 40,534.52 (6) |
| (If negative, enter zero on line 6 and enter the amount less than zero as a positive number on line 1J and/or 1K above) | | |
| **7. Amount Financed** (5 less 6) | $ | 30,959.46 (7) |

**OPTIONAL DEBT CANCELLATION AGREEMENT OR GUARANTEED ASSET PROTECTION WAIVER.** A debt cancellation agreement or guaranteed asset protection waiver (GAP waiver) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy debt cancellation or a GAP waiver, the charge is shown in item 1L of the Itemization of Amount Financed. See your agreement for details on the terms and conditions it provides. It is a part of this contract.

Term N/A Mos.    N/A
         Name of Agreement

I want to buy a debt cancellation agreement or GAP waiver.

Buyer Signs X **D**    N/A

---

**OPTIONAL SERVICE CONTRACT(S)** You want to purchase the service contract(s) written with the following company(ies) for the term(s) shown below for the charge(s) shown in item 1I.

| | | | |
|---|---|---|---|
| I1 Company NAAC | | | |
| Term 84 Mos. or | 100000 | | Miles |
| I2 Company N/A | | | |
| Term N/A Mos. or | N/A | | Miles |
| I3 Company N/A | | | |
| Term N/A Mos. or | N/A | | Miles |
| I4 Company N/A | | | |
| Term N/A Mos. or | N/A | | Miles |
| I5 Company N/A | | | |
| Term N/A Mos. or | N/A | | Miles |

Buyer X **E**    STACY ROSS

---

**Trade-In Vehicle(s)**

**1. Vehicle 1**

| | | |
|---|---|---|
| Year 2018 | Make Toyota | |
| Model Camry | Odometer 53545 | |
| VIN 4T1BZ1HK3JU020971 | | |
| a. Agreed Value of Property | $ | 19,500.00 |
| b. Buyer/Co-Buyer Retained Trade Equity | $ | N/A |
| c. Agreed Value of Property Being Traded-In (a–b) | $ | 19,500.00 |
| d. Prior Credit or Lease Balance | $ | 14,565.48 |
| e. Net Trade-In (c–d) (must be ≥ 0 for buyer/co-buyer to retain equity) | $ | 4,934.52 |

**2. Vehicle 2**

| | | |
|---|---|---|
| Year N/A | Make N/A | |
| Model N/A | Odometer N/A | |
| VIN N/A | | |
| a. Agreed Value of Property | $ | N/A |
| b. Buyer/Co-Buyer Retained Trade Equity | $ | N/A |
| c. Agreed Value of Property Being Traded-In (a–b) | $ | 0.00 |
| d. Prior Credit or Lease Balance | $ | N/A |
| e. Net Trade-In (c–d) (must be ≥ 0 for buyer/co-buyer to retain equity) | $ | 0.00 |

| | | |
|---|---|---|
| **Total Agreed Value of Property Being Traded-In** (1c+2c) | $ | 19,500.00 * |
| **Total Prior Credit or Lease Balance** (1d+2d) | $ | 14,565.48 * |
| **Total Net Trade-In** (1e+2e) | $ | 4,934.52 * |

(*See item 6A–6C in the Itemization of Amount Financed)

**OPTION:** ☐ You pay no finance charge if the Amount Financed, item 7, is paid in full on or before N/A , Year N/A .

SELLER'S INITIALS N/A

---

TRUE AND ACCURATE COMPLETED COPY - UCC NON-AUTHORITATIVE COPY

TRUE AND ACCURATE COMPLETED COPY - UCC NON-AUTHORITATIVE COPY

T820921067-DP820921068 - THIS CUSTOMER COMPLETED COPY WAS CREATED ON 10/06/2023 10:32:54 PM GMT.

THIS IS A CUSTOMER COMPLETED COPY OF THE SIGNED ELECTRONIC FORM HELD BY ROUTEONE LLC.

TRUE AND ACCURATE COMPLETED COPY - UCC NON-AUTHORITATIVE COPY

TRUE AND ACCURATE COMPLETED COPY - UCC NON-AUTHORITATIVE COPY

# OTHER IMPORTANT AGREEMENTS

**1. FINANCE CHARGE AND PAYMENTS**

**a. How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed. Seller - Creditor may receive part of the Finance Charge.

**b. How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose as the law allows.

**c. How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on page 1 of this contract on the assumption that each will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

**d. You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment. As of the date of your payment, if the minimum finance charge is greater than the earned Finance Charge, you may be charged the difference; the minimum finance charge is as follows: (1) $25 if the original Amount Financed does not exceed $1,000, (2) $50 if the original Amount Financed is more than $1,000 but not more than $2,000, or (3) $75 if the original Amount Financed is more than $2,000.

**2. YOUR OTHER PROMISES TO US**

**a. If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

> **GAP LIABILITY NOTICE**
> In the event of theft or damage to your vehicle that results in a total loss, there may be a gap between the amount you owe under this contract and the proceeds of your insurance settlement and deductible. THIS CONTRACT PROVIDES THAT YOU ARE LIABLE FOR THE GAP AMOUNT. An optional debt cancellation agreement for coverage of the gap amount may be offered for an additional charge.

**b. Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

**c. Security Interest.**
You give us a security interest in:
- The vehicle and all parts or goods put on it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract as the law allows. You will make sure the title shows our security interest (lien) in the vehicle. You will not allow any other security interest to be placed on the title without our written permission.

**d. Insurance you must have on the vehicle.**
You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. You agree to name us on your insurance policy as loss payee. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium for the insurance and a finance charge computed at the Annual Percentage Rate shown on page 1 of this contract or, at our option, the highest rate the law permits. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

**e. What happens to returned insurance, maintenance, service, or other contract charges.** If we get a refund of insurance, maintenance, service, or other contract charges, you agree that we may subtract the refund from what you owe.

**3. IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**

**a. You may owe late charges.** You will pay a late charge on each late payment as shown on page 1 of this contract. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments. If you pay late, we may also take the steps described below.

**b. You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once, subject to any right the law gives you to reinstate this contract.
Default means:
- You do not pay any payment on time;
- You give false, incomplete, or misleading information during credit application;
- The vehicle is lost, damaged, or destroyed; or
- You break any agreements in this contract.
The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

**c. You may have to pay collection costs.** You will pay our reasonable costs to collect what you owe, including attorney fees, court costs, collection agency fees, and fees paid for other reasonable collection efforts. You agree to pay a charge not to exceed $15 if any check you give to us is dishonored.

**d. We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device (such as GPS), you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you. If you do not ask for these items back, we may dispose of them as the law allows.

**e. How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). You may redeem the vehicle by paying all you owe, or you may have the right to reinstate this contract and redeem the vehicle by paying past due payments and any late charges, providing proof of insurance, and/or taking other action to cure the default. We will provide you all notices required by law to tell you when and how much to pay and/or what action you must take to redeem the vehicle.

T820921067-DP820921068 - THIS IS A CUSTOMER COMPLETED COPY OF THE SIGNED ELECTRONIC FORM HELD BY THE DEALER

**f.** **We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.

We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses.

If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at the Annual Percentage Rate shown on page 1 of this contract, not to exceed the highest rate permitted by law, until you pay.

**g.** **What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we demand that you pay all you owe at once or we repossess the vehicle, you agree that we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

## 4. WARRANTIES SELLER DISCLAIMS

If you do not get a written warranty, and the Seller does not enter into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.

This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide. If the Seller has sold you a certified used vehicle, the warranty of merchantability is not disclaimed.

## 5.

**Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.

**Spanish Translation: Guía para compradores de vehículos usados.** La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

## 6. SERVICING AND COLLECTION CONTACTS

In consideration of our extension of credit to you, you agree to provide us your contact information for our servicing and collection purposes. You agree that we may use this information to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, as the law allows. You also agree that we may try to contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you. You agree to allow our agents and service providers to contact you as agreed above.

You agree that you will, within a reasonable time, notify us of any change in your contact information.

## 7. APPLICABLE LAW

Federal law and California law apply to this contract. If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

## 8. WARRANTIES OF BUYER

You promise you have given true and correct information during your application for credit, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this contract. Upon request, you will provide us with documents and other information necessary to verify any item contained in your credit application.

## 9. NEGATIVE CREDIT REPORT NOTICE

**We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.**

You waive the provisions of Calif. Vehicle Code Section 1808.21 and authorize the California Department of Motor Vehicles to furnish your residence address to us.

### CREDIT DISABILITY INSURANCE NOTICE CLAIM PROCEDURE

If you become disabled, you must tell us right away. (You are advised to send this information to the same address to which you are normally required to send your payments, unless a different address or telephone number is given to you in writing by us as the location where we would like to be notified.) We will tell you where to get claim forms. You must send in the completed form to the insurance company as soon as possible and tell us as soon as you do.

If your disability insurance covers all of your missed payment(s), **WE CANNOT TRY TO COLLECT WHAT YOU OWE OR FORECLOSE UPON OR REPOSSESS ANY COLLATERAL UNTIL THREE CALENDAR MONTHS AFTER** your first missed payment is due or until the insurance company pays or rejects your claim, whichever comes first. We can, however, try to collect, foreclose, or repossess if you have any money due and owing us or are otherwise in default when your disability claim is made or if a senior mortgage or lien holder is foreclosing.

If the insurance company pays the claim within the three calendar months, we must accept the money as though you paid on time. If the insurance company rejects the claim within the three calendar months or accepts the claim within the three calendar months on a partial disability and pays less than for a total disability, you will have 35 days from the date that the rejection or the acceptance of the partial disability claim is sent to pay past due payments, or the difference between the past due payments and what the insurance company pays for the partial disability, plus late charges. You can contact us, and we will tell you how much you owe. After that time, we can take action to collect or foreclose or repossess any collateral you may have given.

If the insurance company accepts your claim but requires that you send in additional forms to remain eligible for continued payments, you should send in these completed additional forms no later than required. If you do not send in these forms on time, the insurance company may stop paying, and we will then be able to take action to collect or foreclose or repossess any collateral you may have given.

**Electronic Contracting and Signature Acknowledgment.** You agree that (i) this contract is an electronic contract executed by you using your electronic signature, (ii) your electronic signature signifies your intent to enter into this contract and that this contract be legally valid and enforceable in accordance with its terms to the same extent as if you had executed this contract using your written signature and (iii) the authoritative copy of this contract ("Authoritative Copy") shall be that electronic copy that resides in a document management system designated by us for the storage of authoritative copies of electronic records, which shall be deemed held by us in the ordinary course of business. Notwithstanding the foregoing, if the Authoritative Copy is converted by printing a paper copy which is marked by us as the original (the "Paper Contract"), then you acknowledge and agree that (1) your signing of this contract with your electronic signature also constitutes issuance and delivery of such Paper Contract, (2) your electronic signature associated with this contract, when affixed to the Paper Contract, constitutes your legally valid and binding signature on the Paper Contract and (3) subsequent to such conversion, your obligations will be evidenced by the Paper Contract alone.

T820921067-DP820921068 - THIS CUSTOMER COMPLETED COPY WAS CREATED ON 10/08/2023 10:32:54 PM GMT

T820921067-DP820921068 - THIS IS A CUSTOMER COMPLETED COPY OF THE SIGNED ELECTRONIC FORM HELD BY ROUTEONE LLC.

## Seller's Right to Cancel

a.  Seller agrees to deliver the vehicle to you on the date this contract is signed by Seller and you. You understand that it may take some time for Seller to verify your credit and assign the contract. You agree that if Seller is unable to assign the contract to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable to Seller, Seller may cancel the contract.

b.  Seller shall give you written notice (or in any other manner in which actual notice is given to you) within 10 days of the date this contract is signed if Seller elects to cancel. Upon receipt of such notice, you must immediately return the vehicle to Seller in the same condition as when sold, reasonable wear and tear excepted. Seller must give back to you all consideration received by Seller, including any trade-in vehicle.

c.  If you do not immediately return the vehicle, you shall be liable for all expenses incurred by Seller in taking the vehicle from you, including reasonable attorney's fees.

d.  While the vehicle is in your possession, all terms of the contract, including those relating to use of the vehicle and insurance for the vehicle, shall be in full force and you shall assume all risk of loss or damage to the vehicle. You must pay all reasonable costs for repair of any damage to the vehicle until the vehicle is returned to Seller.

## ARBITRATION PROVISION
### PLEASE REVIEW - IMPORTANT - AFFECTS YOUR LEGAL RIGHTS

1.  **EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN YOU AND US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.**

2.  **IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.**

3.  **DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, any allegation of waiver of rights under this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this Vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Provision shall not apply to such claim or dispute. Any claim or dispute is to be arbitrated by a single arbitrator only on an individual basis and not as a plaintiff in a collective or representative action, or a class representative or member of a class on any class claim. The arbitrator may not preside over a consolidated, representative, class, collective, injunctive, or private attorney general action. You expressly waive any right you may have to arbitrate a consolidated, representative, class, collective, injunctive, or private attorney general action. You or we may choose the American Arbitration Association (www.adr.org) or National Arbitration and Mediation (www.namadr.com) as the arbitration organization to conduct the arbitration. If you and we agree, you or we may choose a different arbitration organization. You may get a copy of the rules of an arbitration organization by contacting the organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law and the applicable statute of limitations. The arbitration hearing shall be conducted in the federal district in which you reside unless the Seller-Creditor is a party to the claim or dispute, in which case the hearing will be held in the federal district where this transaction was originated. We will pay the filing, administration, service, or case management fee and the arbitrator or hearing fee up to a maximum of $5,000, unless the law or the rules of the chosen arbitration organization require us to pay more. You and we will pay the filing, administration, service, or case management fee and the arbitrator or hearing fee over $5,000 in accordance with the rules and procedures of the chosen arbitration organization. The amount we pay may be reimbursed in whole or in part by decision of the arbitrator if the arbitrator finds that any of your claims is frivolous under applicable law. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. If the chosen arbitration organization's rules conflict with this Arbitration Provision, then the provisions of this Arbitration Provision shall control. Any arbitration under this Arbitration Provision shall be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.) and not by any state law concerning arbitration. Any award by the arbitrator shall be in writing and will be final and binding on all parties, subject to any limited right to appeal under the Federal Arbitration Act.

You and we retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, unless such action is transferred, removed or appealed to a different court. Neither you nor we waive the right to arbitrate any related or unrelated claims by filing any action in small claims court, or by using self-help remedies, such as repossession, or by filing an action to recover the vehicle, to recover a deficiency balance, or for individual or statutory public injunctive relief. Any court having jurisdiction may enter judgment on the arbitrator's award. This Arbitration Provision shall survive any termination, payoff or transfer of this contract. If any part of this Arbitration Provision, other than waivers of class rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable. You agree that you expressly waive any right you may have for a claim or dispute to be resolved on a class basis in court or in arbitration. If a court or arbitrator finds that this class arbitration waiver is unenforceable for any reason with respect to a claim or dispute in which class allegations have been made, the rest of this Arbitration Provision shall also be unenforceable.

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only to goods or services obtained primarily for personal, family or household use. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

*LAW 553-CA-ARB-ea 3/23 v1*   Page 5 of 6

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.

Buyer Signs X **F** *STACY ROSS*           Co-Buyer Signs X **F** *LORNA ROSS*

**SELLER'S RIGHT TO CANCEL** If Buyer and Co-Buyer sign here, the provisions of the Seller's Right to Cancel section on page 5 of this contract giving the Seller the right to cancel if Seller is unable to assign this contract to a financial institution will apply.

Buyer X **G** *STACY ROSS*           Co-Buyer X **G** *LORNA ROSS*

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED IN LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER OR NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
   **WARNING:**
   YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FOR FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU DO NOT HAVE FULL COVERAGE, SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLING DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT OF THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD.
   FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
   THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.

S/S X **H** *STACY ROSS*           x **H** *LORNA ROSS*

N/A

Notice to buyer: (1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If you have a complaint concerning this sale, you should try to resolve it with the seller.
Complaints concerning unfair or deceptive practices or methods by the seller may be referred to the city attorney, the district attorney, or an investigator for the Department of Motor Vehicles, or any combination thereof. After this contract is signed, the seller may not change the financing or payment terms unless you agree in writing to the change. You do not have to agree to any change, and it is an unfair or deceptive practice for the seller to make a unilateral change.

Buyer Signature X **I** *STACY ROSS*           Co-Buyer Signature X **I** *LORNA ROSS*

**The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.**

**THERE IS NO COOLING-OFF PERIOD UNLESS YOU OBTAIN A CONTRACT CANCELLATION OPTION**
California law does not provide for a "cooling-off" or other cancellation period for vehicle sales. Therefore, you cannot later cancel this contract simply because you change your mind, decide the vehicle costs too much, or wish you had acquired a different vehicle. After you sign below, you may only cancel this contract with the agreement of the seller or for legal cause, such as fraud. However, California law does require a seller to offer a two-day contract cancellation option on used vehicles with a purchase price of less than forty thousand dollars ($40,000), subject to certain statutory conditions. This contract cancellation option requirement does not apply to the sale of a recreational vehicle, a motorcycle, or an off-highway motor vehicle subject to identification under California law. See the vehicle contract cancellation option agreement for details.

YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT. YOU ACKNOWLEDGE THAT YOU HAVE READ ALL PAGES OF THIS CONTRACT, INCLUDING THE ARBITRATION PROVISION ON PAGE 5, BEFORE SIGNING BELOW. YOU CONFIRM THAT YOU RECEIVED A COMPLETELY FILLED-IN COPY WHEN YOU SIGNED IT.

Buyer Signature X **J** *STACY ROSS*    Date 10/06/2023    Co-Buyer Signature X **J** *LORNA ROSS*    Date 10/06/2023

Buyer Printed Name STACY ROSS           Co-Buyer Printed Name LORNA ROSS

If the "business" use box is checked in "Primary Use for Which Purchased": Print Name N/A           Title N/A

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. Another owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other Owner Signature X **N** N/A           Address N/A

**GUARANTY:** To induce us to sell the vehicle to Buyer, each person who signs as a Guarantor individually guarantees the payment of this contract. If Buyer fails to pay any money owing on this contract, each Guarantor must pay it when asked. Each Guarantor will be liable for the total amount owing even if other persons also sign as Guarantor, and even if Buyer has a complete defense to Guarantor's demand for reimbursement. Each Guarantor agrees to be liable even if we do one or more of the following: (1) give the Buyer more time to pay one or more payments; (2) give a full or partial release to any other Guarantor; (3) release any security; (4) accept less from the Buyer than the total amount owing; or (5) otherwise reach a settlement relating to this contract or extend the contract. Each Guarantor acknowledges receipt of a completed copy of this contract and guaranty at the time of signing. Guarantor waives notice of acceptance of this Guaranty, notice of the Buyer's non-payment, non-performance, and default; and notices of the amount owing at any time, and of any demands upon the Buyer.

Guarantor X **K** N/A    N/A    Date N/A           Guarantor X N/A    Date N/A

Address N/A           Address X N/A

Seller Signs PB AND J AUTOMOTIVE INC    Date 10/06/2023    By X **L** *ZAFAR KHOKHAR*    Title FINANCE MANAGER

Seller assigns its interest in this contract to _____ (Assignee) under the terms of Seller's agreement(s) with Assignee.

☐ Assigned with recourse    ☒ Assigned without recourse    ☐ Assigned with limited recourse

Seller PB AND J AUTOMOTIVE INC

By X **M** _____           Title FINANCE MANAGER

# EXHIBIT B



9/12/2024

VIA EMAIL: STACY@WESTSIDECONNECT.NET

Stacy Ross;
15455 Glenoaks Blvd,
Sylmar, CA 91342

      Re:     2023 Hyundai Nexo Fuel Cell, VIN KM8J84A67PU035589.

Dear Ms. Ross:

      Thank you for allowing Hyundai Motor America ("HMA") the opportunity to review your concerns.    We have completed our investigation of your claim.    HMA offers to repurchase your vehicle.    In order to calculate the repurchase amount, please provide the following documents as soon as possible:

1.     A legible copy of your sales or lease contract;
2.     A complete payment history of your vehicle's loan or lease;
3.     If the vehicle is not paid off, a 30-day payoff amount directly from the lienholder or lessor, as well as the applicable per diem (please ensure that the full loan account number and the lienholder's or lessor's overnight mailing address are included);
4.     If the vehicle is paid off, a legible copy of the front and back of the title to your vehicle;
5.     A legible copy of the current vehicle registration; and,
6.     Legible copies of any related incidental damages/expenses, including but not limited to reasonable repair, towing, and rental car costs actually incurred by you directly related to the issue for which we are repurchasing this vehicle.

      As soon as we receive these documents from you, we will provide the repurchase amount for your review and written acceptance.    You must continue to make timely payments as required by your lienholder or lessor.    Further, if you leased your vehicle, please do not drop your vehicle off at a dealership pursuant to an early lease turn-in.    We request that you coordinate the vehicle surrender's date, time, and location directly with us.

      We look forward to working with you toward a resolution of this matter.    You can reach me directly by phone at (714) 465-1874 or through HMA's website at https://owners.hyundaiusa.com/us/en/contact-us.html.

               Sincerely,

               Kourtnee,
               CSS Case Manager.

# EXHIBIT C

From: **CSS** css@hmausa.com
Subject: **Hyundai Consumer Affairs case# 23630256**
Date: **Dec 20, 2024** at 4:12:42 PM
To: **Stacy Ross** Stacy@westsideconnect.net
Cc: **NationalCA@hmausa.com**

Hello STACY,

I have attached Hyundai Motor America's offer to this email for your review prior to my scheduled phone call with you on 12/20/23. I will be reaching out to you to discuss the offer as well is go over any questions that you may have regarding the calculations listed.

As your vehicle qualifies for repurchase under your state's Lemon Law, we have offered you the options of a vehicle repurchase, or a cash settlement in lieu of repurchase. Thus, please note, there are two signature sections of this document. It is most important that you sign under the section that is appropriate for the offer in which you are accepting; Cash in Lieu of Repurchase or Vehicle Repurchase. Additionally, we will require all registered owners to sign this offer letter.

If you have any questions regarding the attached letter prior to our scheduled call, please contact me by replying to this email without changing the subject line or contact me at my direct line listed below.

Thank you for being a valued Hyundai owner.
Kourtnee
National Consumer Affairs
(714) 465 - 1874
Hyundai Motor America

pdf  **HMA Offer letter- Ross.pdf**
     **189 KB**



12/18/24

VIA EMAIL: stacy@westsideconnect.net

Stacy Ross and Lorna Ross
15455 GLENOAKS BLVD
SYLMAR, CA 91342.

     Re:     2023 Hyundai Nexo Fuel Cell, VIN KM8J84A67PU035589

Dear Stacy Ross and Lorna Ross :

Hyundai Motor America ("HMA") offers to repurchase your vehicle based on the terms laid out below. As an alternative to a repurchase, HMA offers to pay you $5,000.00 and for you to keep the vehicle in exchange of signing the settlement agreement. You can choose either a repurchase of the vehicle or a settlement, but not both.

Should you choose to proceed with the vehicle repurchase, it will be completed according to the below terms:

1.    HMA will pay the purchase price of the vehicle itself, charges for transportation and manufacturer-installed options, finance charges actually paid by you, sales tax, license fees, registration fees, and other official fees;

2.    HMA will reimburse, subject to proof, any related incidental damages/expenses, including but not limited to registration, reasonable repair, towing, and rental car costs actually incurred by you directly related to the issue for which we are repurchasing this vehicle;

3.    HMA will take a deduction for the value of the use of the vehicle between the time when you took possession of the vehicle and the time when you first delivered the vehicle to HMA's dealership to fix the problem ("Statutory Mileage Offset");

4.    HMA will payoff the outstanding loan/lease amount to the lender to transfer the ownership of the vehicle from you to HMA.

5.    **You must continue to make timely payments as required by your lienholder or lessor until the vehicle is surrendered.**  Any overage or refund that results due to additionally made payments after this agreement is signed, shall be obtained directly from your lienholder or lessor;

6.    We assume that the vehicle has no significant collision, vandalism, or other damage (e.g., fire, flood, significant accident damage), except any such damage caused by any alleged nonconformity.   If significant damage does exist, please notify us to discuss;

7.    You will surrender the vehicle with all original equipment currently in your possession, including all key fobs, Owner's Manuals and Handbooks (if any items have been lost or are otherwise no longer in your possession, please let us know and we will still accept return of the vehicle);

8.    All vehicle registration fees and penalties, including any parking or toll tickets, must be paid by you prior to the vehicle surrender;

9.    You will execute all documents necessary for HMA to transfer title out of your name and into HMA's name at the time of the vehicle surrender;



10. You will surrender the vehicle to HMA with clear title, other than the loan to be paid by HMA, at a mutually agreed-upon Hyundai dealership. Should you be unable to deliver the vehicle, you will provide access to the vehicle for HMA to take delivery of it;

11. In return for HMA repurchasing your vehicle, you hereby release HMA, Genesis Motor America, LLC, Hyundai Motor Company, and all of their subsidiaries, affiliates, and dealers from any and all claims relating to your purchase/lease or ownership of the vehicle, such as those for breach of warranty or violation of the California Lemon Law. This is not intended to waive any personal injury claims arising out of the use or operation of the vehicle. You hereby warrant that you have no such injuries or claims as of the date of execution of this agreement; and

12. You acknowledge that, as part of the repurchase, HMA will reimburse you for any applicable sales tax you have paid, and HMA will pay any remaining sales tax that may be owed in connection with paying off the outstanding loan or lease amount on your vehicle.

Your repurchase is calculated as follows:

| | |
|---|---|
| (a) The purchase price of the vehicle itself | $62,420 |
| (b) Charges for transportation and manufacturer-installed options | $0.00 |
| (c) Finance charges actually paid by the customer | $0.00 |
| (d) Sales tax, license fees, registration fees, and other official fees ($85.00 +$5937.98+$22.00+$406.00+$316.00+$7.00) | $6,773.98 |
| (e) Incidental damages (Vehicle's non-conformity must be a substantial factor in causing the expense) | $852.00 |
| Deduct Statutory Mileage Offset: $62,420.00 + $0.00 * (21,032 − 36) /120,000 | -$10,921.42 |
| Additional items (if applicable) Deduct Rebate | -$33,000.00 |
| **Total repurchase** | **$26,124.56** |
| **Vehicle payoff to lender** | **$24,939.60** |
| **Total restitution to you after payment to lender** | **$1,184.96** |

If you disagree with this calculation, believe this offer is inadequate, or do not understand any of the terms, please contact us so that we may resolve any outstanding questions or concerns. We look forward to working with you towards a resolution of your claim. You can reach me directly by phone at (714) 465-1874 or through HMA's website at https://owners.hyundaiusa.com/us/en/contact-us.html.

Sincerely,


Kourtnee,
Customer service specialist.



I accept the terms and conditions set forth in this agreement with my signature on the _____ day of _____, 2024:

Please choose one:

I accept the cash settlement and keep my vehicle:

_____
Stacy Ross


_____
Lorna Ross


**OR**

I accept the repurchase option:

_____
Stacy Ross


_____
Lorna Ross

# EXHIBIT D



12/31/24

<u>VIA EMAIL: stacy@westsideconnect.net</u>

Stacy Ross
15455 Glenoaks Blvd,
Sylmar, CA 91342.

Re:     2023 Hyundai Nexo Fuel, VIN KM8J84A67PU035589.

Dear Ms. Ross:

Thank you for contacting Hyundai Motor America ("HMA").   We have reviewed your vehicle's repair history and evaluated your request.   Based on our investigation of the repair history to date, we have determined that a repurchase is not warranted under the California Lemon Law.

To the extent you disagree with our evaluation, if there is any additional or new information that you would like us to consider, such as photographs, videos, or another repair order, we are willing to reevaluate this matter upon receipt of those materials.

Please note that any remaining terms of your vehicle's limited warranties as set forth in the Owner's Handbook and Warranty Information continue to apply.

We would also like to take this opportunity to remind you that you may take advantage of the following alternative dispute resolution ("ADR") program provided by HMA:

BBB AUTO LINE
BBB National Programs, Inc.
1676 International Drive, Suite 550
McLean, VA 22102
1-800-955-5100

The BBB AUTO LINE program, which performs arbitration services on disputes such as this one, is provided at no cost to you, and is part of HMA's effort to provide an impartial third-party organization to equitably resolve concerns such as yours.   To begin the ADR process, simply call the BBB National Programs at the number listed above and you will be sent a Customer Claim Form, along with a handbook describing how BBB AUTO LINE works.   A decision is ordinarily rendered within forty (40) days of AUTO LINE's receipt of a properly completed Customer Claim Form.   BBB would then mail you a copy of the arbitrator's decision and, if accepted by you, Hyundai would be required to comply with the decision of the arbitrator within certain time limitations.   BBB would, thereafter, verify that the arbitrator's decision had been completed.   Again, this service is offered to you at no cost and if you do not agree with the BBB's decision, it is not binding on you, but any BBB decision in your favor is binding on HMA should you choose to accept it.

Please contact me if you have any questions.   You can reach me directly by phone at (714) 465-1874 or through HMA's website at https://owners.hyundaiusa.com/us/en/contact-us.html.

Sincerely,


Kourtnee,
Customer Service Specialist.